[No. 9988–4–I. Division One. July 5, 1983.]

BACHE HALSEY STUART SHIELDS, INC., *Respondent,* v. EUGENE ERDOS, ET AL, *Appellants.*

226

*Eugene Erdos,* pro se.

*Lane, Powell, Moss & Miller* and *James L. Robart,* for respondent.

Callow, J.—Eugene Erdos appeals from a judgment which granted Bache Halsey Stuart Shields, Inc. (Bache), $40,628.19 in damages for a commodity futures account deficit and which dismissed the consolidated claim brought by Erdos against Bache.

The issues presented are:

(1) Whether the violation of certain rules and regulations of the National Association of Securities Dealers, the Chicago Mercantile Exchange, and the Commodity Futures Trading Commission, in connection with the opening, management, and liquidation of a nondiscretionary commodity futures account, exempts a client from all liability for trades made on such account.

(2) Whether Bache's conduct contributed to and proximately caused the termination of Erdos' employment.

(3) Whether a commodities brokerage firm is required to wait for formal presentation of checks drawn on an account with insufficient funds prior to liquidation of a nondiscretionary commodity futures account.

Bache Halsey Stuart Shields, Inc., is a securities and commodities broker licensed to do business in the state of Washington. Eugene Erdos is a licensed stockbroker familiar with trading in the commodities market and at the time pertinent to this litigation was employed by Birr Wilson & Company (Birr Wilson). On October 4, 1978, Erdos opened an account with Bache in order to trade commodity futures, a highly risky financial activity. In opening his account, Erdos voluntarily signed a customer agreement with Bache and, although he did not read it, was generally aware of its contents.

Erdos' account with Bache was a nondiscretionary account, meaning only Erdos could authorize transactions on the account. While Erdos did consult with Bache's employees regarding the financial consequences of certain trades, all transactions made on his account were the result of his own decisions and involved lumber futures contracts traded on the Chicago Mercantile Exchange. Erdos knew the risks involved with commodity margin accounts.

Although Erdos initially invested only $5,000 in his account, he received the minimum margin credit line of $20,000 as a result of certain representations made to Bache. By October 17, 1978, through a series of successful trades, Erdos had increased his initial investment to approximately $20,000. However, subsequent fluctuations in the price of lumber futures and additional orders placed by Erdos required the deposit of additional funds in the Erdos account to meet his applicable margin requirement. Bache and Erdos had agreed that margin calls in the Erdos account would be met the same day, and Erdos was aware that his account could be liquidated if additional funds were not submitted.

On Wednesday, October 25, 1978, Erdos delivered a $15,000 check drawn on the Royal Bank of Canada to

Bache to meet a margin call. The next day, October 26, 1978, Erdos made an additional purchase and as a result was required by Bache to deposit an additional $52,211 in order to meet his margin maintenance requirement. Erdos gave Bache a check for that amount, again drawn on the Royal Bank of Canada, to meet this margin call. That same day, October 26, 1978, Bache contacted the Royal Bank and learned that both checks had been written on an overdrawn account. Bache immediately contacted Erdos who assured Bache that sufficient funds would be deposited in the Royal Bank account the next day, Friday, October 27, 1978. Based on this assurance, Bache deposited the two checks.

When Bache learned that Erdos had not deposited any funds in the Royal Bank account by Monday, October 30, 1978, and they could not contact Erdos, Bache liquidated the lumber futures accounts in Erdos' account on Tuesday, October 31, 1978. Erdos stopped payment on the checks after learning of the liquidation, but before the checks had been formally presented. Following liquidation, a debit balance of $31,911 remained in Erdos' account.

On November 3, 1978, Bache commenced a cause of action against Erdos to recover the debit balance in Erdos' account, accrued interest, attorney's fees and costs. Erdos' employment with Birr Wilson was terminated shortly thereafter. On January 11, 1979, Erdos answered Bache's complaint and counterclaimed for damages arising out of his termination with Birr Wilson. This counterclaim was withdrawn by stipulation of counsel on October 22, 1979. In May of 1980, Erdos moved for and was denied an opportunity to amend his answer to again include a counterclaim against Bache for damages as a result of his termination from Birr Wilson. Erdos then commenced an independent action against Bache and Greg Wood, a Bache account executive, and his wife on June 3, 1980, alleging damages arising out of his termination by Birr Wilson. The Woods were ultimately dismissed from the action. On June 16, 1980, the trial court permitted consolidation of the two actions for trial.

A nonjury trial was conducted in December 1980. Judgment was entered on February 9, 1981, granting $40,628.19 in damages to Bache against Erdos and dismissing with prejudice the consolidated claim brought by Erdos against Bache.

The first issue is whether the violation of certain rules and regulations of the National Association of Securities Dealers, the Chicago Mercantile Exchange, and the Commodity Futures Trading Commission in connection with the opening, management, and liquidation of a nondiscretionary commodity futures account exempts a client from liability for trades made on such account.

Initially, Erdos challenges the findings and conclusions which found that Bache was not in violation of any applicable rule or regulation of the National Association of Securities Dealers (NASD); Chicago Mercantile Exchange (CME); or the Commodity Futures Trading Commission (CFTC); to wit, certain Commodity Trade Future Regulations (CFTR) requiring Bache to provide Erdos with a written risk disclosure document (CFTR 1.55) and to diligently supervise Erdos' account (CFTR 166.3) and certain rules and regulations of the NASD and CME requiring receipt of written consent by Bache from Erdos' employer prior to the opening of Erdos' account (NASD Rules of Fair Practice 2178, art. 3, § 28; CME Rule 931(f)), requiring a specific procedure prior to liquidation of a customer's account (CME Rule 827), requiring the application of the "know your customer suitability" rule (NASD Rules of Fair Practice 2152, art. 3, § 2), and which prohibited Bache from extending Erdos excessive credit based on his margin maintenance requirement (NASD Rules of Fair Practice 2180; CME Rule 827). Erdos contends that the governing standard of review is whether the findings are supported by substantial evidence and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 373, 617 P.2d 704 (1980).

The trial court's judgment will be affirmed if the

result reached is supported by any legal reason within the pleadings, the facts, and the applicable law. *Curtiss v. YMCA,* 82 Wn.2d 455, 511 P.2d 991 (1973). Here, even assuming that Bache violated certain rules and regulations of the CME, NASD, and CFTC, Erdos has not cited any specific statutory or case law which indicates that such violations would constitute a valid defense to Bache's action to collect the debit balance in Erdos' account.

■ Erdos' account with Bache was nondiscretionary which meant that he personally directed Bache in making all purchases and sales of future contracts for his account following discussions with Bache's employees regarding the financial consequences of such trades. In other words, Bache had no discretion to make any trades on Erdos' account in his behalf. All transactions in his account involved lumber futures traded on the CME. As such, Erdos' account was governed by the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1 *et seq. Sherry v. Diercks,* 29 Wn. App. 433, 441, 628 P.2d 1336 (1981).

> In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred.

*Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978); *see R.J. Hereley & Son Co. v. Stotler & Co.,* 466 F. Supp. 345 (N.D. Ill. 1979). The 1974 amendments to the Commodity Exchange Act, the Commodity Futures Trading Commission Act of 1974, vest exclusive jurisdiction over commodity futures trading with the CFTC. 7 U.S.C. § 4a; *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216, 232 (6th Cir. 1980), *aff'd,* 456 U.S. 353, 72 L. Ed. 2d 182, 102 S. Ct. 1825 (1982). 7 U.S.C. § 13a–2 further vests jurisdiction in the federal courts for all actions brought under the CEA, but presumably a defense based on the CEA may be asserted in state court. *See Sherry v. Diercks, supra* at 438–39.

An individual has an implied private right of action under the CEA, as noted by the United States Supreme

Court when it stated: "the private cause of action under the CEA that was previously available to investors survived the 1974 amendments." *Curran v. Merrill Lynch,* at 388. This preexisting implied private right of action under the applicable rules and regulations of CEA, however, has generally been available only where the violation has been tantamount to fraud and an individual proves a violation of the antifraud provision, section 6b, or the antimanipulation provision, section 13b, of the CEA.

> A private right of action had been recognized, however, to enforce the antifraud provisions of the Commodity Exchange Act as it existed prior to the 1974 amendments. *Deaktor v. L.D. Schreiber & Co.,* 479 F.2d 529 (7th Cir. 1973), *reversed on other grounds,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1974) (7 U.S.C. § 13b—antimanipulation provision); *Booth v. Peavey Company Commodity Services,* 430 F.2d 132 (8th Cir. 1970) (7 U.S.C. § 6b—antifraud provision); *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440 (N.D.Ill.1967) (§ 6b); *United Egg Producers v. Bauer International Corp.,* 311 F.Supp. 1375 (S.D.N.Y.1970) (§ 13b); *McCurnin v. Kohlmeyer & Co.,* 340 F.Supp. 1338 (E.D.La.1972) (§ 6b); *Johnson v. Arthur Espey, Shearson, Hammill & Co.,* 341 F.Supp. 764 (S.D.N.Y.1972) (§ 6b); *Arnold v. Bache & Co., Inc.,* 377 F.Supp. 61 (M.D.Penn.1973) (§ 6b).

*Hofmayer v. Dean Witter & Co., supra* at 737. No implied private right of action is available under the CEA for violations of the rules and regulations of the CME, NASD, and CFTC in the absence of conduct tantamount to fraud.

*Sherry v. Diercks, supra,* considered whether, under the CEA, a customer could raise as a defense the alleged violation by his brokerage firm of certain rules of the New York Stock Exchange (NYSE) or the NASD, regarding the so-called "suitability doctrine." As here, the brokerage firm was suing the customer for a debit balance owing on his account. The court, however, refused to imply broker liability based solely on a violation of NYSE or NASD rules and held that, "unless a customer proves a violation of the antifraud provisions of the Commodity Exchange Act, 7 U.S.C.A. § 6b, recovery of damages against a broker is not

an available remedy." 29 Wn. App. at 441. It should further be noted that the NASD rules are promulgated pursuant to section 780–3(b) of the Securities Exchange Act and, hence, the applicability of such rules is thrown into question by virtue of the CEA's preemption of federal and state security laws over commodity futures trading. *See Curran v. Merrill Lynch*, at 386–87; *R.J. Hereley & Son Co. v. Stotler & Co., supra* at 347.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir.), *cert. denied*, 444 U.S. 838, 62 L. Ed. 2d 50, 100 S. Ct. 76 (1979) involved an action to recover an alleged deficiency in defendant's commodity trading account. In defense of the action, defendant raised, among others, a counterclaim alleging that plaintiff failed to adequately supervise his account, failed to "know your customer" and failed to review his suitability and qualifications as a commodities investor. He argued that the plaintiff's violation of its house rules, stock exchange rules, dealer association rules, and good brokerage practice entitled him to a private cause of action. The court rejected this contention stating, "the courts have typically found no private right of action exists for violation of exchange or dealer association rules in the absence of a finding of fraud." 593 F.2d at 134.

Similarly, in *Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352 (10th Cir. 1978), suit was initiated to collect a deficit balance in a commodity futures trading account. The defendant counterclaimed for damages for violation of the CEA, regulations promulgated under the act, Rule 942 of the CME, conspiracy, and fraud. The court stated:

> There is no evidence in the record of behavior on the part of either Master Commodities or RB&H arising to the level of willful or fraudulent conduct envisioned by the cases to support recovery under the Commodities Exchange Act or the regulations thereunder. Pertinent to Rule 942 of the Chicago Mercantile Exchange, this circuit has held that in an appropriate case we might imply a cause of action for private redress for violation of an

exchange rule. *Utah State University v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977). But there we held that "something more than mistake or negligence must be shown," and affirmed a dismissal where the allegations were not tantamount to fraud. 549 F.2d at 168.

586 F.2d at 1356–57; *see Hofmayer v. Dean Witter & Co., supra* at 738–39 (mere failure to register in violation of the CEA does not constitute such fraud, deceit, or misrepresentation sufficient to void all trading done on customer's behalf).

Here, the trial court found:

> None of Bache's actions misled Erdos. Bache made no attempt to mislead Erdos. At no time in his dealings with Bache, or its employees, was Erdos defrauded or was an attempt made to defraud Erdos. Bache did not make any false representations to Erdos or omit any facts necessary to prevent any misleading representations, in connection with Erdos' dealings with Bache.

Erdos has not assigned error to this portion of the finding of fact and it is a verity on appeal. *Pier 67, Inc. v. King Cy.,* 71 Wn.2d 92, 426 P.2d 610 (1967). Sufficient grounds upon which to base a defense on the alleged violations of the rules and regulations of the CME, NASD, and the CFTC have not been shown.

Moreover, the courts have rejected attempts by sophisticated investors such as Erdos to avoid paying for losses in their accounts by alleging rule violations. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks,* 548 F.2d 615 (5th Cir. 1977), the court rejected the contention of a sophisticated commodity futures investor that he should not be required to pay back any remaining indebtedness because the extension of credit violated a rule or regulation of the Chicago Board of Trade.

> To adopt such an argument would permit commodity futures investors knowingly to accept extensions of credit from a broker which violate the Board of Trade's rules or regulations and repudiate losses that ensue or accept profits that follow. The only risk to the investor would be his initial deposit in a margin account, "initial margin", which represents only a fraction of the potential losses or

hoped for profits. We do not accept this position . . . 548 F.2d at 615–16. Similarly, in *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.,* 500 F. Supp. 491, 501 (S.D. Fla. 1980), where a commodities broker sued to recover a debit balance and the customer counterclaimed for the alleged improper liquidation of lumber futures contract positions the court stated:

> Malina, who was an experienced and knowledgeable commodities investor, will not be given relief where he alleges that his account was maintained in an undermargined condition [in violation of Rule 928 of the CME] prior to its liquidation.

Erdos was a sophisticated investor and had been employed as a stockbroker in both Canada and the United States since 1963. He is a licensed member of NASD which permits him to do business in all securities in the United States as well as in Canada and Japan. He had previously traded commodities, including lumber futures, was aware of how commodity margin accounts operate, and from his employment and personal experience, knew the risks involved in commodities trading. He was aware of his deficient margin account status.

Erdos did not establish a valid defense to Bache's claim even if the record had established the existence of violations of the rules and regulations.

The second issue is whether Bache's conduct contributed to and proximately caused the termination of Erdos' employment.

Erdos contends that the trial court erred in entering the following finding of fact:

> In early November, 1978, Birr Wilson terminated Erdos' employment. There were several factors which caused Birr Wilson's termination of Erdos. There was no improper conduct by Bache which contributed to Birr Wilson's decision. Erdos' damages (if any) related to his discharge were not proximately caused by any conduct of Bache and Bache has no liability for such damage (if any).

This finding is supported by substantial evidence. Edward

Fisch, Birr Wilson's general counsel and direct compliance officer, testified at a deposition that Birr Wilson had given its permission for the opening of Erdos' account with Bache; that Birr Wilson felt there had been substantial compliance with the applicable rules and regulations; that the fact that Erdos maintained a commodity account with Bache was not a factor in his termination; and that there were several factors involved which influenced Birr Wilson's decision to terminate Erdos. This evidence supports the trial court's conclusion that, "Erdos has failed to sustain his burden of proof with relation to his claims against Bache for an alleged wrongful termination by Birr Wilson and that claim should be dismissed with prejudice." We concur. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 373, 617 P.2d 704 (1980).

The third issue is whether a commodities brokerage firm is required to wait for formal presentation of checks drawn on an account with insufficient funds prior to liquidation of a nondiscretionary commodity futures account.

Erdos contends that the trial court erred in concluding that Bache properly liquidated Erdos' account prior to formal presentment of the checks he had delivered on October 25 and 26, 1978, in response to Bache's margin calls. He argues that the delivery of the two checks suspended the underlying obligations on the margin calls and, hence, under RCW 62A.3–802(b), Bache was required to wait for formal presentment of the checks prior to liquidation. We disagree.

RCW 62A.3–802 states, in pertinent part:

(1) Unless otherwise agreed where an instrument is taken for an underlying obligation

. . .

(b) in any other case the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation.

Here, the parties expressly agreed that Bache could liquidate Erdos' account at any time it deemed it necessary to protect itself. The Bache customer agreement signed by Erdos stated, in part:

5. I will maintain such margins as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my accounts. *Whenever in your discretion you deem it desirable for your protection, (and without the necessity of a margin call) . . ., you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, sell any or all securities, or commodities or contracts relating thereto which may be in your possession,* or which you may be carrying for me, or buy any securities, or commodities or contracts relating thereto of which my account or accounts may be short, in order to close out in whole or in part any commitment in my behalf or you may place stop orders with respect to such securities or commodities and such sale or purchase may be made at your discretion on any Exchange or other market where such business is then transacted . . .

(Italics ours.)

Moreover, "[t]he refusal of a party to accept or pay for reasons other than improper presentment . . . excuses the condition [of presentment]." Washington State Bar Ass'n, *Commercial Law Deskbook* § 9.6(5)(c) (1982). RCW 62A.3–511(3)(b) provides that "[p]resentment is . . . entirely excused when . . . acceptance or payment is refused but not for want of proper presentment."

The purpose of presentment is to determine whether or not the maker, acceptor or drawee will pay or accept; and when that question is clearly determined the holder is not required to go through a useless ceremony. The provision applies to a definite refusal stating no reasons.

Official Comment 7, RCWA 62A.3–511.

In *Rains v. Lewis,* 20 Wn. App. 117, 122–23, 579 P.2d 980 (1978), it was argued, as here, that "had formal presentment been made, enough time lapse would have been involved so that the account would have had sufficient

funds." This contention was rejected, the court holding that the formal presentment of a check is not necessary where payment is refused for want of funds and not for want of proper endorsement or presentment.

On October 25 and 26, 1978, Erdos gave two checks to Bache drawn on the Royal Bank of Canada in order to meet a margin maintenance demand. Bache learned by calling the bank that the checks were written on an overdrawn account. The Bache branch manager contacted Erdos, who assured him that Erdos was going to Vancouver, British Columbia, the next day—Friday, October 27, 1978—to arrange for funds to be deposited in the account on which the checks were drawn. Bache deposited the checks in reliance of this assurance and did not liquidate his account. On Friday, October 27, 1978, Bache again contacted the Royal Bank but could not determine whether Erdos had deposited funds to cover the checks. Bache was also unable to contact Erdos on that day.

On Monday, October 30, 1978, Bache learned that no deposit had yet been made and the account remained overdrawn. Bache again attempted to contact Erdos but was unable to do so. Bache then liquidated the lumber futures contracts in Erdos' account on Tuesday, October 31, 1978. Under these circumstances, the trial court properly found that "formal presentment and dishonor of the checks . . . would have been a useless act," and concluded that "Bache's conduct in regard to Erdos' two checks . . . drawn on the Royal Bank of Canada was authorized by Erdos' representations to Bache and RCW 62A.3–511."

The judgment is affirmed.

WILLIAMS and CORBETT, JJ., concur.