**THOMSON McKINNON SECURITIES, INC., Plaintiff–Appellee,**

v.

**Emory L. CLARK, Defendant–Appellant.**

No. 89–8538.

United States Court of Appeals, Eleventh Circuit.

May 23, 1990.

Hoke Smith, III, Clark & Smith, P.C., Atlanta, Ga., for defendant-appellant.

Paul W. Stivers, Laura H. Robison, Rogers & Hardin, Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, TUTTLE and RONEY*, Senior Circuit Judges.

RONEY, Senior Circuit Judge:

Thomson McKinnon Securities, Inc. sued one of its former clients, Emory L. Clark, to recover payment of Clark's account, which resulted from losses in what has become known as "Black Monday," the stock market decline on October 19, 1987. The district court granted summary judgment to Thomson McKinnon on its breach of contract action, rejecting Clark's affirmative defenses. We affirm.

Thomson McKinnon is a stock brokerage firm based in New York City, with an office in Atlanta, Georgia. Clark is a lawyer in Atlanta with a general practice, emphasizing bankruptcy law. On June 6, 1986, Clark opened an account with Thomson McKinnon in order to trade on the exchange markets. In the customer account agreement executed by the parties, Clark agreed to pay any debts to Thomson McKinnon arising out of the account. La-

ter, in October 1986 and September 1987, Clark signed agreements authorizing Thomson McKinnon to trade in option securities on his behalf. In the September 1987 agreement, Clark acknowledged that he was aware of the high risk involved in options trading and that such trading was "not unsuitable for [him] in light of [his] investment objectives, financial situation and needs, experience and knowledge." Clark represented that his financial condition met the requirements imposed by the rules of the exchange markets. In these agreements Clark promised to reimburse Thomson McKinnon for any liabilities the brokerage would incur with respect to Clark's margin calls or any requests for additional collateral on his market transactions.

When a trader opens an account with a broker, the broker buys and sells options on securities on behalf of his client, the trader. The parties on the other end of these transactions look to the broker, not the trader, to satisfy obligations arising out of the transactions. The broker then credits or debits the trader's account, depending on whether there was a gain or loss in the transaction. The trader provides the broker with "margin," either money or securities, as security against potential losses. As a trader's account incurs greater losses, the broker may require its client to meet a "margin call," that is, to provide more collateral to the broker in order to keep the account active. The broker may also "close out" the trader's account to limit exposure to further losses. *See generally Prudential–Bache Securities, Inc. v. Stricklin,* 890 F.2d 704, 705–06 (4th Cir. 1989).

In 1987, Clark, through Thomson McKinnon, began to trade in short term options, primarily index options representing a group of securities. Clark was a speculator in the market. His general strategy was to deal short term only, to make quick profits if possible and to sell out quickly from losing positions. The broker assigned to Clark's account at Thomson McKinnon was Jerome C. Dodgen. Clark contacted

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

Dodgen frequently to obtain his advice on market conditions, but Clark made all final decisions on what positions he wished to take in his account. Clark was an experienced and sophisticated trader, having traded securities over a period of twenty years with several brokers.

On Monday, October 19, 1987, the stock market experienced a massive 508 point decline. Clark lost between $7,000 and $8,000 on his account that day. Clark was in frequent contact with Dodgen throughout Monday, and knew that he had incurred substantial losses. On Tuesday morning, October 20, Clark called Dodgen and instructed him to enter into more transactions on Clark's behalf. Clark hoped to make back the losses he suffered the previous day. Clark told Dodgen that he was unable to pay the Monday losses immediately. Dodgen advised Clark not to enter into these new transactions because of the volatility of the markets, and Dodgen also stated that the brokerage may have established a policy against placing new orders. Dodgen nonetheless placed Clark's order. At the end of the day Clark's account had lost a great deal of money. When Clark informed Thomson McKinnon that he could not meet its margin call, Thomson McKinnon closed out the account, and sued Clark to recover over $130,000 unpaid on the account.

In its order granting summary judgment to Thomson McKinnon, the district court determined that Thomson McKinnon had established its claim for the principal and interest arising from Clark's breach of contract. Clark had initially counterclaimed asserting a breach of contract by Thomson McKinnon. He voluntarily withdrew the counterclaim. The district court ruled that Clark could not raise breach of contract as an affirmative defense to Thomson McKinnon's claims, because he had previously agreed to dismiss his counterclaim with prejudice. The court, however, also rejected Clark's proffered affirmative defenses on the merits, holding that Clark's allegations that Thomson McKinnon breached certain exchange rules did not state an affirmative defense to his obligation to pay. The district court commented that Clark's

allegation that Thomson McKinnon violated its own internal trading rules by placing Clark's order was unsupported by the record, since Thomson McKinnon instituted its policy against trading after Dodgen had already placed Clark's orders.

Thomson McKinnon concedes that the district court erred in holding that the dismissal of Clark's counterclaim barred his reliance on the affirmative defense of breach of contract. This error, however, does not require reversal of the summary judgment for Thomson McKinnon. The district court as an alternative holding, properly rejected the defense on its merits.

■ Clark contends that Thomson McKinnon violated several rules of the Chicago Board of Options Exchange, the market in which the relevant transactions occurred. These rules require a broker to exercise due diligence in learning its client's financial condition and investment objectives, to maintain an amount of money in its client's margin account proportional to the account's level of trading, and to engage in just and equitable principles of trading. CBOE Rules 4.1, 9.7, 12. Clark alleges that Thomson McKinnon violated all these rules by placing Clark's orders on October 20. A sophisticated and experienced trader, however, cannot defend against his broker's action for nonpayment on the grounds that the broker violated exchange rules by over-extending credit to the trader. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615 (5th Cir.) (per curiam), *cert. denied*, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977). *Accord Bache Halsey Stuart Shields, Inc. v. Erdos*, 35 Wash.App. 225, 667 P.2d 89 (1983); *Murlas Bros. Commodities, Inc. v. Bushman*, 91 Wis.2d 126, 280 N.W.2d 769 (1979). *See also Thompson v. Smith Barney, Harris Upham & Co., Inc.*, 709 F.2d 1413, 1419 (11th Cir.1983) (no private cause of action under federal securities laws for violation of exchange rules).

■ The alleged defense is not strengthened by the fact that the exchange rules were incorporated into the agreements between Clark and Thomson McKinnon.

When an experienced trader with knowledge of the circumstances relating to his own financial condition and his position in the market expressly requests his broker to ignore a contractual term by placing a trade on his behalf, that trader clearly waives the relevant term as a condition precedent to his obligation to pay. *See Goldenberg v. Bache & Co.*, 270 F.2d 675, 681 (5th Cir.1959); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 428–31 (N.D. Cal.1968), *aff'd*, 430 F.2d 1202, 1207–09 (9th Cir.1970); *Blunt, Ellis & Loewi, Inc. v. Igram*, 319 N.W.2d 189 (Iowa 1982); 5 Williston on Contracts § 689 (3d ed. 1961). *See also Ray E. Friedman & Co. v. Jenkins*, 738 F.2d 251, 254 (8th Cir.1984) ("sophisticated, reckless trader" could not rely on technical breach of contract involving exchange rules to avoid payment of debit balance to broker) (citing *Brooks*, 548 F.2d at 616–17). The same equitable concerns supporting the result in *Brooks*, 548 F.2d at 615–16, apply in this situation.

■ Clark argues that Thomson McKinnon violated its own internal policy by placing his orders on October 20. He asserts that although the district court concluded that Thomson McKinnon instituted its non-trading policy after Dodgen had placed Clark's orders, the case presented an issue of fact that could not be resolved at summary judgment. Even if Thomson McKinnon violated its own internal policies, however, Clark could not assert that fact as an affirmative defense to his liability to pay under the trading contract. A broker's internal policies do not rise to the level of law or public policy. Whether the firm's nontrading policy was in place when Dodgen placed Clark's order, or thereafter, is not a genuine issue of material fact that would preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

AFFIRMED.