In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-4412

ADM INVESTOR SERVICES, INC.,

*Plaintiff-Appellee,*

*v.*

MARK W. COLLINS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 1823—**John F. Grady**, *Judge.*

ARGUED SEPTEMBER 25, 2007—DECIDED FEBRUARY 7, 2008

Before EASTERBROOK, *Chief Judge*, and BAUER and
KANNE, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Mark Collins traded futures
contracts on the Chicago Board of Trade through ADM
Investor Services, a futures commission merchant (the
equivalent of a stockbroker for derivatives). Over
the course of 18 months, Collins made almost $1 million.
His last trade, on July 27, 2004, was in soybean contracts.
Collins purchased 40 contracts for delivery in August 2004
while selling 40 contracts for delivery in November.
Matched pairs of long and short contracts take a posi-
tion in the difference between the prices, which the
futures business calls the spread. On July 27 the August
contract was selling for $6.69 per bushel and the Novem-

ber contract for $5.89, a spread of 80¢. Collins stood to make money if the spread increased and to lose if it decreased.

Three days later the spread was down to 30¢. The November price had declined to $5.69, so the short position for that month had increased in value, but the August price stood at $5.995, and Collins had lost $99,000 more on his long position than he gained on his short position. ADM made a margin call. Collins posted only $15,000, so ADM liquidated his position by offsetting purchases. It sent Collins a bill for $85,521.83, which he did not pay. ADM filed this suit under the diversity jurisdiction to collect, and the district court entered judgment in its favor. 2006 U.S. Dist. LEXIS 3282 (N.D. Ill. Jan. 26, 2006), 2006 U.S. Dist. LEXIS 68049 (N.D. Ill. Sept. 26, 2006).

Collins has two defenses. One is that Shell Rock Enterprises, an introducing broker, has paid ADM about $75,000 under its contractual guarantee of Collins's trades. This means, Collins insists, that ADM is not the real party in interest. The brief reads as if counsel (Collins's brother) had never heard of the collateral-source doctrine. That a third party reimburses part of a loss does not disable the injured person from recovering under tort or contract law. ADM did not assign its rights to Shell Rock (there is no subrogation agreement), so ADM is the proper plaintiff. How ADM and Shell Rock settle accounts between themselves is none of Collins's business.

The other defense is that the soybean contracts were "illegal" because on July 27, 2004, a margin call was outstanding on another of Collins's trades. He insists that ADM should have used the money tendered as margin on the soybean spread to satisfy the margin call on the existing trade; had ADM done this, it could not have executed the soybean-spread trades, because the initial

margin would have been insufficient. Rule 431.012(11) of the Chicago Board of Trade provides:

> Members shall not accept orders for new trades from a customer, unless the minimum initial margin on the new trades is deposited and unless the margin on old commitments in an account equals or exceeds the initial requirements on hedging and spreading trades and/or the maintenance requirements specified in Regulations 431.03 and 431.05 on all other trades.

The Commodity Exchange Act requires futures commission merchants to abide by a board of trade's rules; it follows, Collins insists, that his trades of July 27 were illegal and that he need not cover his losses. He invokes the principle that courts do not enforce "illegal contracts"—for example, cartel agreements or wagering debts in states where gambling is prohibited. ADM replies that on July 27 Collins still had time to meet the margin call on his older trades, so "the maintenance requirements specified in Regulations 431.03 and 431.05 on all other trades" did not prevent ADM from allowing its customer to make additional trades. We need not decide whether this is right, because Collins's argument founders on more fundamental grounds.

A soybean spread is not "illegal" in the sense of the rule against enforcing "illegal contracts." There is nothing unlawful about buying or selling futures contracts for soybeans. They are freely traded on public exchanges. A contract does not become "illegal" just because a trader fails to put down a deposit (that's what margin is in a futures market), any more than a buyer's failure to post earnest money makes a contract to sell Blackacre "illegal." Failure to post security as required enables the other side to rescind but does not provide benefits to the person who has failed to honor his own obligations.

Another way to see this is to ask why margin is required in futures transactions. In securities markets, the full purchase price must be paid to the seller before a transaction is complete; margin is a loan from the dealer to the customer, secured by the assets acquired in the transaction. The Federal Reserve regulates these loans, along with many other aspects of financial intermediation, as part of its control of the aggregate money supply. Regulation of this kind could be seen as an effort to protect the general public from the effects of investors' and brokers' activities. Margin in the futures business, by contrast, does not represent an extension of credit, and there are no third-party effects.

A futures contract is executory; no asset changes hands when the contract is formed. See generally *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004). The buyer (the holder of the long position) transacts with the seller (the creator of the short position) through a clearing corporation. When a long and a short agree to a contract, each makes his promise to the clearing corporation, which then becomes the counterparty of each original party. The risk that the clearing corporation assumes is that an obligor won't perform when the time comes to deliver the soybeans (or to pay for them). Reducing this risk of nonperformance, usually called the "counterparty risk" in derivatives markets, is the role of margin. See Lester G. Telser, *Margins and Futures Contracts*, 1 J. Futures Markets 225 (1981); Haiwei Chen, *Price Limits and Margin Requirements in Futures Markets*, 37 Financial Rev. 105 (2002).

Exchanges and clearing corporations set margin high enough that short-term price movement is likely to leave a net equity balance available to the dealer. If price movements reduce its security unduly, the dealer may have time to demand an additional deposit—and to liquidate the position, before the balance goes negative,

as a form of self-protection if the investor does not meet the margin call. Occasionally, though, prices move so fast that a position's value is negative before a margin call can be issued; what happened in July 2004 to the August–November soybean spread shows the risk. The futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades. When Collins did not post the margin, ADM had to buy offsetting positions in the market, which enabled the clearing corporation to close Collins's trades without absorbing a loss.

It should now be apparent that margin requirements in futures markets are not designed to protect investors such as Collins from adverse price movements. Margin protects counterparties from investors who may be unwilling or unable to keep their promises. Counterparties are protected directly by clearing corporations (that's why trading can be anonymous and contracts homogeneous); clearing corporations are protected not only by the balance in their portfolios (every long position exactly offsets a short) but also by the futures commission merchants, which generally are substantial businesses; the futures commission merchants are protected, to a degree, by the margin deposits posted by customers such as Collins. So the person injured by a shortfall of margin was ADM, not Collins, and ADM's failure to take all available steps to protect itself from defaulting customers is hardly a reason why customers should be allowed to renege. No surprise, then, that both circuits that have addressed the issue have held that a customer's failure to post required margin for a futures contract does not excuse him from paying. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615 (5th Cir. 1977); *Thomson McKinnon Securities, Inc. v. Clark*, 901 F.2d 1568 (11th Cir. 1990). We agree with these

decisions. As Justice Holmes once put it, there is a vital "policy of preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271 (1909) (Holmes, J., dissenting).

Still another way to see this point is to observe that balky customers are not in the zone of interests protected by margin-posting requirements. Margin protects dealers and counterparties *from* defaulting customers, who are in no position to complain when the protection of their trading partners turns out to be incomplete.

Collins is particularly poorly positioned. Almost $450,000 of his $1 million net profit on transactions through ADM came from trades executed while a margin call was pending on another open position. If, as Collins maintains, any contract entered into while a margin call is pending is void, then Collins is the loser: the cost to him of avoiding an $85,000 debt will be the need to make restitution of the rest, for a net judgment of $365,000 in ADM's favor. Collins should give thanks that he has lost this appeal.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*