# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos.  08-3961, 08-3966, 08-3967, 08-3981, 08-3988,
       08-3989, 08-3990, 10-1043, 10-1045, 10-1046,
       10-1049, 10-1056, 10-1058 & 10-1059

JOHN W. COSTELLO, not individually,
but as Litigation Trustee Under the
Comdisco Litigation Trust,

*Plaintiff-Appellee,*

*v.*

STEVEN R. GRUNDON, et al.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:05-cv-763, -727, -767, -740, -746,
-764, -736—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 6, 2010—DECIDED OCTOBER 18, 2010

Before KANNE, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.*  This consolidated case comes to
us on appeals from the district court's grant of summary
judgments in favor of the plaintiff-appellee, John W.
Costello, Litigation Trustee under the Comdisco Litiga-

tion Trust, and against defendants-appellants in an action to enforce certain promissory notes. For the reasons that follow, we affirm in part and vacate in part the grants of summary judgment in favor of the Trustee and remand for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

The defendants-appellants (the "Borrowers") are former high-level employees of Comdisco Inc., who participated in Comdisco's shared investment plan ("SIP") program ("SIP Program") offered in early 1998 by purchasing shares of Comdisco stock. One hundred percent of the stock purchase price was funded by personal loans from participating banks ("Lenders") represented by First National Bank of Chicago (later Bank One) as their agent. To secure the loans, the Borrowers executed promissory notes ("SIP Notes" or "Notes") in their personal capacities. Bank One had developed and implemented SIPs for other companies and promoted the SIP concept to Comdisco. Comdisco chose to deal with Bank One because of the bank's experience with SIPs for other companies.

Comdisco guaranteed the loans as provided in a Facility and Guaranty Agreement between Comdisco and the Lenders. The Comdisco guaranty was "a condition to the loan arrangement" Comdisco had made with the First National Bank of Chicago. (SA:244.) Comdisco received the loan proceeds directly from the Lenders and held the SIP Shares. It seems probable that without the

guaranty, most of the loans would not have been made. SIP Participants were required to purchase a minimum of 8,000 shares of Comdisco stock. At $34.50 per share, that resulted in a minimum purchase price and loan of $276,000. The loans' principal amounts ranged from $276,000 to $1,725,000. Loans were made in excess of $1,000,000 to one borrower (05-737) who reported no net worth to the Bank, to another (05-745) for almost ten times his net worth, and to two others (05-735 & 05-726) for more than five times their net worth.

Comdisco introduced the SIP Program to prospective participants during a weekend meeting in Palm Springs, California. Prospective participants had to attend the meeting or listen to the presentation. The Borrowers received a binder of materials (approximately 240 pages) explaining the terms of the SIP Program (the "SIP Materials"). The SIP Materials included the SIP Plan Summary; Questions and Answers; Comdisco, Inc. Shared Investment Plan; the Facility and Guaranty Agreement between Comdisco and Bank One, individually and as agent (the "Facility Agreement"); a form of Master Promissory Note; and an Appendix that included a package of Bank One's documents. The Bank's package consisted of a form of Note; the Facility Agreement; a Letter of Direction; a Loan Application; an Account Application; and a letter from Bank One, stating that the Bank had to receive a completed personal financial statement to complete the loan application.

The SIP Presentation and SIP Materials informed the prospective participants of various restrictions on their ability to sell their SIP Shares and that SIP Participants

were obligated for a specified time period to share any gains on the sale of the shares with Comdisco. More specifically, the shares were restricted in that: (a) Comdisco would hold a borrower's purchased shares until that borrower's loan to Bank One was discharged; (b) the borrower had to deliver a stock power, endorsed in blank, concerning his or her shares to Comdisco (a blank stock power is generally required when an institution holds securities as collateral for a loan so the institution may transfer and sell the stock to satisfy the debt); (c) the borrower had to execute an irrevocable Letter of Direction with Comdisco and the Bank to ensure that all cash dividends on the shares went into the borrower's account at Bank One to pay the accrued interest on the loan; (d) the proceeds from a permitted sale of the stock had to "first be used to repay the Loan," interest and fees at Bank One; (e) the borrower paid a prepayment penalty to Bank One if the loan was paid early; and (f) the certificate representing the borrower's shares contained a legend as to the stock's restricted status. (The language of the Notes reflected that the stock being purchased was "Restricted Stock" and the Facility Agreement, which was incorporated into the terms of the Notes, referred to the SIP Shares as "Restricted Stock.") The SIP Program was structured so that the SIP Shares could not be sold during the first year of the program, with a few exceptions. An "[SIP Participant was] entitled to 100% of the gain, after payment of all amounts due on the loan, unless [the Participant] voluntarily terminate[d] [his/her] employment or [sold] the shares within three (3) years after purchase. In either such event, the Company [was] entitled to 50% of any gain upon sale." (SA:207)

The SIP Participants were required to notify Comdisco of any intention to sell their SIP Shares because Comdisco had the right to repurchase the SIP Shares. The SIP Materials indicated that the promissory notes to be executed in connection with the loans had a fixed maturity date, that at maturity a final balloon payment of principal and interest would be due, and that Comdisco would guarantee the SIP Notes.

The SIP Materials stated that "the Loan is not secured by the stock" (SA:226) and that the "SIP shares do not serve as collateral for the loan . . . the loan is not a margin loan." (SA:229.) When presenting the SIP Plan, Comdisco advised prospective participants that the "loan is not technically secured by the securities . . . and this is not a margin account." (SA:355.) During the SIP Presentation, an unidentified person asked, "[C]an th[e] shares be used as security for other transactions or collateral for other type[s] of loans?" A Comdisco representative answered:

> No, and the reason being is they are restricted from the standpoint that the company has certain rights with respect to that stock, depending upon your employment. And also there's restrictions under the terms of the bank loan that you have that there are certain things that will happen with the proceeds to the extent that you sell it before the bank loan is paid off.

> So while it is not technically a secured loan, the company retains the stock physically and you cannot pledge that for other loans.

(SA:365.)

Comdisco also provided prospective SIP Participants with information regarding whether: (a) the proposed loans were margin loans; (b) the proposed loans were secured by the stock; (c) the stock could be pledged for another loan; (d) the proposed loans would violate or be inconsistent with Regulation G or Regulation U; and (e) Comdisco's performance of its obligations under each Loan Document to which it was a party would violate any applicable legal requirement. The SIP Materials included Comdisco, Inc.'s 1998 Stock Option Program, which provided in Section 6.11:

> **No Illegal Transactions.** The Program and all Stock Options granted pursuant to it are subject to all laws and regulations of any governmental authority which may be applicable thereto; and notwithstanding any provision of the Program or any Stock Options, Participants shall not be entitled to exercise Stock Options or receive the benefits thereof and the Company shall not be obligated to deliver any Common Stock or pay any benefits to a Participant if such exercise, delivery, or payment of benefits would constitute a violation by the Participant or the Company of any provision of any such law or regulation.

(SA:237-238.)

The SIP Materials described the Facility Agreement as "the agreement between Comdisco and [Bank One] establishing the loan program" and stated that "[b]y signing the Note, you will represent that you have carefully reviewed the Facility Agreement." (SA:225.) In the

Facility Agreement, Comdisco represented and warranted that:

> The execution and delivery of, and performance by the Company of its obligations under, each Loan Document to which it is a party will not result in a breach or violation of, conflict with, or constitute a default under the certificate of incorporation or bylaws of the Company, any Requirement of Law . . . . " (SA:283.) The Facility Agreement was included within the meaning of "Loan Document"; "Requirement of Law" included "the Securities Act of 1933, the Securities Exchange Act of 1934, [and] Regulations G [and] U . . . of the Board of Governors of the Federal Reserve System." Comdisco further represented and warranted that:

> No part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G [or] . . . Regulation U . . . . Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G [or] . . . Regulation U . . . .

(SA:283-284.)

In discussing Comdisco's Guaranty, the Facility Agreement repeatedly referred to the "collateral securing the Guaranteed Debt." However, section 7.06 of the Facility Agreement provides:

> No Collateral. Notwithstanding any reference herein to any collateral securing any of the Guar-

anteed Debt, it is acknowledged that, on the date hereof, neither the Company nor any Borrower has granted, or has obligation to grant, any security interest or other lien on any of its property (including, without limitation, the Restricted Stock) to the Lenders as security for the Guaranteed Debt.

(SA:290.) "Guaranteed Debt" is defined as the principal and interest on the loans to the borrowers, plus any other fees of borrowers owing pursuant to the Notes. (SA:288.)

The Borrowers elected to participate in the SIP Program, executing a SIP option exercise form and a Letter of Direction, authorizing the Bank to pay the proceeds of the loan to Comdisco. Each of them also executed an SIP Promissory Note. The proceeds of the SIP Loans were remitted to Comdisco as consideration for the purchase of the SIP Shares. Comdisco caused the appropriate number of shares to be allocated and transferred to its Registrar and Transfer Agent, Mellon Investor Services, LLC, for the benefit of the Borrowers. The Borrowers opened accounts at the First National Bank of Chicago in order to receive distributions of stock dividends that were used to offset payments due under the SIP Notes.

Within six months, Comdisco's stock split, doubling the number of shares each SIP Participant had obtained. And in just over two years, Comdisco's stock was trading at $53 per share. Several participants decided to sell their shares and did so at a price that not only satisfied their

loan obligations but also earned them a profit, even after sharing with Comdisco the required 50% of the balance of the gain realized on the sale after payment of principal, interest, and fees due on the loan. However, the tide turned and in July 2001, Comdisco filed for bankruptcy. This was an event of default under the Notes and caused Bank One to accelerate all amounts outstanding on the Notes. The bankruptcy also triggered an event of default under the Facility Agreement. The Lenders filed a proof of claim in Comdisco's bankruptcy for approximately $133 million. Comdisco settled its guarantor obligation to the Lenders for a payment of over $126 million in exchange for the Lenders' assignment of all rights under the Notes against the Borrowers to the Comdisco Litigation Trustee. The bankruptcy court approved the settlement, and the district court held that the Trustee is the holder of the Notes with all rights of enforcement.

In 2005, the Trustee filed separate actions against each Borrower, seeking to enforce the SIP Notes. The Borrowers raised many affirmative defenses, including fraud and duress. The Trustee moved for summary judgment against two of the defendants, James Duncan and Lyssa K. Paul. Duncan and Paul filed a cross-motion for summary judgment, arguing that the Notes were unenforceable based on violations of federal margin regulations. In December 2007, the district court denied their cross-motion and granted the Trustee's motion. The court ruled that the Trustee had proved his prima facie case on the SIP Notes and rejected the defendants' "primary defense that the SIP Program was fraudulent"

(SA:177), concluding that Comdisco's alleged misrepresentations were expressions of legal opinion, which could not support a fraud claim. (SA:178). The court found that the defendants had not shown reliance on the alleged misrepresentations. (*Id.*). The district court also rejected the defendants' argument that the loans were unenforceable because they violated Regulation U, after concluding that the defendants could not assert the alleged illegality of the loans as an affirmative defense. (SA:180.) As for the negligent misrepresentation defense, the court found based on the record that the defense was not available as against Comdisco or the banks. The district court rejected all other affirmative defenses.

The Trustee subsequently moved for summary judgment against the remaining defendants, incorporating its memorandum in support of its summary judgment motions against Duncan and Paul. The defendants amended their affirmative defenses, asserting that Comdisco committed securities fraud and violated securities laws and that the violations constituted breaches of contract which excused the Borrowers' nonperformance. The Trustee supplemented his memorandum to address the new defenses. The district court granted summary judgment to the Trustee, concluding that the SIP Plan did not violate the margin regulations and, even if it had, the defendants had no evidence of scienter and thus could not establish the Rule 10b-5 claim in their fifth affirmative defense. The court also decided that even if there was a technical violation of any regulation, such a violation did not render the Notes unenforceable because the defendants were not within the

"zone of interests" protected by the regulations. The district court entered judgments, and the Borrowers appealed.

Within one year of the entry of the judgments, the Trustee filed a Motion for Correction, or in the Alternative, Modification of Judgment Pursuant to Federal Rule of Civil Procedure 60. The motion states that "due to an inadvertent oversight, the judgments understated the amounts of interest owing under the promissory notes on which judgment was entered." (60SA:147.) The Borrowers opposed the motion on procedural grounds, arguing that any relief, if available, was available only under Rule 60(b)(1). The district court indicated that it was inclined to grant the Trustee's Rule 60(a) motion, and we granted the district court leave to rule on the Rule 60(a) motion. The district judge entered Rule 60(a) Amended Final Judgment Orders, *nunc pro tunc* to the dates of the prior judgments (October 2008), increasing the judgment amounts entered against the Borrowers who are the appellants in the cases before us by over $1 million. Amended Judgments were entered and the Borrowers timely appealed. The appeals were consolidated for disposition. Additional facts are discussed later in this opinion as appropriate.

## II. ANALYSIS

The Borrowers argue that the district court erred in: (1) concluding that they could not assert violations of Regulations G and U as affirmative defenses; (2) concluding that Comdisco and Bank One did not violate

the Regulations; (3) placing the burden of proving a violation of the Regulations on the Borrowers; (4) concluding that even if the Borrowers proved regulatory violations, they could not avoid summary judgment in favor of the Trustee based on such violations; (5) granting summary judgment on the affirmative defenses based on violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, illegality under Section 17(a) of the Securities Act of 1933, and the excuse-of-nonperformance; (6) extending its *Duncan/Paul* summary judgment rulings to these Borrowers; and (7) granting the Trustee's Rule 60(a) motion and increasing the amount of the original judgments. We will address each argument as necessary.

## A. Regulations G and U

The Borrowers' amended affirmative defenses allege that Comdisco and the Bank violated Regulation G or U by: (1) extending credit to the Borrowers, (2) arranging for the extension thereof, and (3) failing to obtain executed forms from the Borrowers as prescribed by the Federal Reserve Board. Specifically, the Borrowers contend that Comdisco violated Regulation G by extending purpose credit to each Borrower (in the form of Comdisco's guaranty to the Bank) secured by his margin stock in an amount exceeding 50% of the purchase price of that stock.[1] They claim that the Bank violated Regulation U

---

[1] Regulation G provided: "*Limitation on extending purpose credit.* No lender . . . shall extend any purpose credit, secured directly
(continued...)

by arranging for Comdisco to extend credit to the Borrowers on better terms and conditions than it could legally extend credit under Regulation U and by extending purpose credit (the loan) to each Borrower, indirectly secured by his margin stock in an amount exceeding 50% of the purchase price of that stock.[2] In addition, the Borrowers allege that both Comdisco and the Bank committed "purpose statement" violations of Regulation G or U by failing to obtain from each Borrower a Federal Reserve Form G-3 or U-1.[3]

---

[1] (...continued)
or indirectly by margin stock in an amount that exceeds the maximum loan value of the collateral securing the credit as set forth in § 207.7 of this part ['The maximum loan value of any margin stock . . . is fifty per cent of its current market value.']" 12 C.F.R. § 207.3(b). Unless otherwise noted, all citations in this opinion are to the 1998 edition of the Code of Federal Regulations, which contains the versions of the regulations in effect at the relevant time.

[2] Regulation U provided: "*Arranging credit.* No bank may arrange for the extension . . . of any purpose credit, except upon the same terms and conditions under which the bank itself may extend . . . purpose credit under this part." 12 C.F.R. § 221.3(a)(3). It also provided: "*Extending credit.* No bank shall extend any purpose credit, secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the collateral securing the credit." *Id.* § 221.3(a)(1).

[3] Regulation G required that in the case of extension of credit secured directly or indirectly by margin stock, "the lender shall require its customer to execute Form FR G-3." 12 C.F.R. § 207.3(e). And Regulation U required a bank that extends
(continued...)

We begin with the Borrowers' contention that the district court erred in granting summary judgment on the ground that Comdisco and the Bank had not violated Regulations G and U. The Borrowers assert that in moving for summary judgment the Trustee did not challenge whether Comdisco violated Regulation G. It seems that they are correct. (See SA:442—Consolidated Supplemental Mem. Supp. Pl.'s Mots. Summ. J. Against SIP Defs. 10 ("the SIP Defendants have not and cannot prove that *the Lenders* violated the margin restrictions set forth in Regulation G or Regulation U.") (emphasis added)). As such, the Borrowers were under no obligation to present all of their evidence of Regulation G violations in order to defeat the Trustee's summary judgment motion. *See, e.g.*, *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment."). (Of course, the Borrowers would have had to prove Regulation G violations to obtain summary judgment in their favor.) It would be unfair to uphold a grant of summary judgment in favor

---

[3] (...continued)

such credit in an amount greater than $100,000 to "require its customer to execute Form FR U-1." *Id.* § 221.3(b).

of the Trustee based on the lack of evidence that Regulation G was violated because the Borrowers did not have a fair opportunity to respond to such an argument.

As for the Bank's alleged violations of Regulation U, the Trustee argued that the Bank had not relied on the SIP Shares as collateral, thus asserting the good-faith non-reliance exception to the meaning of "indirectly secured." See 12 C.F.R. § 221.2(g)(2)(iv) (stating that "indirectly secured" "[d]oes not include . . . an arrangement [under § 221.3(g)(1)] if: . . . [t]he bank, in good faith, has not relied upon the margin stock as collateral in extending . . . the particular credit"); 12 C.F.R. § 221.117 (discussing when a bank in "good faith" has not relied on stock as collateral). This good-faith non-reliance exception only applies to extension or maintenance violations; it does not apply to arranging violations. *See* 12 C.F.R. §§ 221.2(g)(2)(iv), 221.117(a). (Nor would this exception have any applicability to Comdisco and its alleged violation of Regulation G.)

Furthermore, whereas the burden of establishing the affirmative defense of illegality would be on the Borrowers, the Trustee bore the burden of proving the good-faith non-reliance exception. *Cf. Knox v. Cook County Sheriff's Police Dep't*, 866 F.2d 905, 907 (7th Cir. 1988) (stating that the statute of limitations is an affirmative defense but the burden of proving an exception thereto is on the plaintiff). The record establishes genuine issues of material fact as to whether the Bank meets the two criteria that indicate that it has not relied on the stock as collateral such that the exception applies:

(1) the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan, and (2) the loan was not payable on demand or because of fluctuations in market value of the stock, but instead was payable on one or more fixed maturities which were typical of maturities applied by the bank to loans otherwise similar . . . .

12 C.F.R. § 221.117(b). The Borrowers' financial statements support a reasonable inference that the Bank did not rely on them to support the loans. Loans were made in excess of $1,000,000 to one borrower (05-737) who reported no net worth to the Bank, to another (05-745) for almost ten times his net worth, and to two others (05-735 & 05-726) for more than five times their net worth. The transcript of the SIP Presentation lends support to the inference that the Bank did not rely on the financial statements; Comdisco's representatives essentially said as much to the prospective SIP Participants. See SA:367 ("Obviously, most of us don't have a credit that can support a quarter million or half million, whatever the number is, of loans, but there is a Comdisco guaranty there. However, if someone is in bankruptcy, [the Bank] probably would not let [the loan] go through. They look for the obvious ones."). In addition, in arguing that it satisfied the good-faith non-reliance exception, the Trustee did not argue that the SIP Notes were "payable on one or more fixed maturities *which were typical of maturities applied by the bank to loans otherwise similar . . . .*" 12 C.F.R. § 221.117(b) (emphasis added). Thus,

the Trustee did not carry his burden in proving that the Bank satisfied the good-faith non-reliance exception.

In determining whether Regulations G and U were violated, the district court considered whether the SIP Shares directly or indirectly secured the loans or the guaranty. The court wrote that "[t]he restrictions placed on the SIP shares do suggest that the shares indirectly secured the loans, and if the court were writing on a totally clean slate, it might agree with defendants' argument. But the slate is not entirely clean. . . ." The court then considered that prior to implementation of the SIP Program, Comdisco, through its outside legal counsel, Lola Hale, had sought an opinion from the Federal Reserve Bank that the SIP loans would not be directly or indirectly secured by the securities purchased through the SIP Program. Hale received a response in the form of a letter from James B. McCauley, Senior Attorney for the Federal Reserve Bank of Chicago. The McCauley letter opined that the "proposed transaction d[id] not constitute a loan secured 'directly or indirectly' by the purchased stock as contemplated by Regulations G and U." (SA:512.) The letter stated that "[t]his opinion relies heavily upon your assertion that 'there is no reference . . . either in the note or in the Facility Agreement to any restriction on the transfer of the securities to be purchased . . . nor do those securities form collateral for the Note.'" (*Id.*) McCauley also wrote that "[t]he legal

staff of the Board of Governors[4] has been consulted . . . [and] has concurred in this opinion," but emphasized that the opinion was a staff opinion only—not that of the Board and that "different facts could compel a different conclusion." (SA:513.)

The Borrowers correctly pointed out to the district court that Hale's letter to the Federal Reserve Bank requested concurrence only that Bank One's loan would not be deemed to be, directly or indirectly, secured by the securities purchased. Hale did not ask whether Comdisco's guaranty would be directly or indirectly secured by the stock, whether Comdisco's guaranty would violate Regulation G, or whether Bank One would commit an "arranging" violation of Regulation U. The Borrowers also stated that Hale's letter failed to mention several restrictions on the stock, including that Comdisco had a right of first refusal on a sale of the shares; Comdisco's Compensation Committee could impose restrictions on the timing, amount, and form of the sale of the shares; and the stock could not be pledged as collateral for any other loan. In addition, the Notes and Facility Agreement referred to the stock as "Restricted Stock", and the Facility Agreement used the phrase "collateral securing the Guaranteed Debt" in reference to the Restricted Stock. (SA:605.) The district court agreed that Hale's letter did not provide a complete list of the restrictions on the stock, but concluded that it set out the

---

[4] Presumably the Board of Governors of the Federal Reserve System.

"key restriction" that "any outstanding amounts on the loan would be paid from the proceeds of any sale of the stock at any time." (AA:11.) The court found this restriction to be the most suggestive "that the loans (or guarantee) were indirectly secured by the stock because it is this restriction that would most likely ensure repayment of the loan." (AA:11-12.) Because the Bank was informed of this restriction, the court gave the opinion in the McCauley letter substantial weight and concluded that the SIP Plan did not violate Regulation G or U. (AA:12.)

The Borrowers contend that the district court erred in deferring to the McCauley letter. The Trustee responds that it is unclear whether the district court gave a heightened level of deference to the letter and, in any event, the court was entitled to defer to the letter's reasoning. Although the district court's decision states that it was giving the staff's opinion "substantial weight," other language in the decision implies that the court may have deferred to what it believed (mistakenly) was an official opinion of the Federal Reserve Board. The court stated that the Board and its staff have primary responsibility for interpreting the Exchange Act and its regulations and that the staff's opinion is entitled to substantial weight, citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980) (holding deference to official staff opinions of Federal Reserve Board interpreting the Truth in Lending Act and Regulation Z, unless irrational, was appropriate), and *Revlon, Inc. v. Pantry Pride, Inc.*, 621 F. Supp. 804, 815 (D.C. Del. 1985) ("this Court will accord substantial weight to the [Federal Reserve Board] staff's opinions"). The reliance on

*Milhollin* and *Revlon* suggests that the district court thought the opinion was from "the Federal Reserve Board."

But the McCauley letter is not an official staff opinion of the Federal Reserve Board. McCauley works for the Federal Reserve *Bank* of Chicago, not the Federal Reserve Board. The Board and the Banks are "two expressly independent statutory entities*." Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve Sys.*, 132 F.3d 985, 989 (4th Cir. 1997). The Board is created and empowered by subchapter II of Title 12 of the United States Code, 12 U.S.C. §§ 241-250; the Federal Reserve banks are created and empowered by subchapter IX, 12 U.S.C. §§ 341-361. The authority to apply and enforce § 7(d) of the Securities Exchange Act is delegated to the Securities Exchange Commission, 15 U.S.C. §§ 78u(d), 78u-3(a)—not the Federal Reserve Bank of Chicago. And the authority to undertake "administrative lawmaking" is delegated to the Board of Governors. 12 U.S.C. § 248(k). Although the Board may delegate certain of its functions to Federal Reserve banks, functions "relating to rulemaking or pertaining principally to monetary and credit policies" may not be delegated. 12 U.S.C. § 248(k). Although McCauley consulted with the staff of the Board of Governors and the staff agreed with his opinion, the McCauley opinion was not published in either the *Federal Reserve Regulatory Service*, the looseleaf service published by the Board which includes official staff opinions, *see* 12 C.F.R. § 261.10(d)(4), or any other official source.

The Trustee asserts that "the best reading" of the district court's opinion is that it followed *Krzalic v. Republic*

*Title Co.*, 314 F.3d 875, 879 (7th Cir. 2002) (explaining that an agency's less formal pronouncements may be entitled to some deference), and gave the McCauley letter something less than *Chevron*-style deference, see *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). This appears to be deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (an agency's interpretation may be entitled to some deference according to its "power to persuade"). *See United States v. Mead Corp.*, 533 U.S. 218, 235-38 (2001). Yet it is unclear how the Trustee reaches this conclusion. Neither *Krzalic*, *Chevron*, nor *Skidmore* was mentioned in the district court's opinion. Nonetheless, the McCauley letter is some indication that the regulations were not violated and the court could consider it according to its persuasiveness. *Cf. Skidmore*, 323 U.S. at 140 (informal agency "opinions . . . while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance"); *see also Sehie v. City of Aurora*, 432 F.3d 749, 753 (7th Cir. 2005) (considering but ultimately finding unpersuasive opinion letters of the Department of Labor ("DOL") interpreting the meaning of a regulation promulgated under the Fair Labor Standards Act ("FLSA")).[5]

---

[5] The opinions were issued by the Wage and Hour Division of the DOL, which was authorized to administer and enforce the FLSA and promulgate regulations thereunder. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 676 (1947). Here, the

(continued...)

But more importantly, given the omissions in Hale's letter and the qualifications to McCauley's opinion, it cannot be said that the record conclusively establishes that the SIP Plan did not violate Regulation G or U. In *United States v. Mead Corp.*, the Court reiterated *Skidmore*'s holding that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency . . . ." 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139). The Court instructed that the determination whether *Skidmore* deference is owed turns on the "'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . .'" *Id.* at 228 (quoting *Skidmore*, 323 U.S. at 140); s*ee also Am. Fed'n of Gov't Emps. v. Rumsfeld*, 262 F.3d 649, 656 (7th Cir. 2001) ("informal [agency] interpretations are entitled to respect to the extent that they have the power to persuade") (quotations omitted). Given the omissions in Hale's letter, the McCauley opinion is not persuasive on the question of whether Comdisco or the Bank violated Regulation G or U. We note the district court's statement that if it were writing on a totally clean slate, it might have agreed with the Borrowers that the SIP Shares indirectly secured the loans and guarantee. But the court thought it owed the McCauley opinion some deference, without

[5] (...continued)
Federal Reserve Bank of Chicago is not authorized to administer and enforce Regulation G or U.

examining its thoroughness, validity, consistency, and persuasiveness. (SA:11.)

We emphasize that the issue is not whether the stock directly secured the Bank's loans, but whether the stock indirectly secured the loans and/or the guaranty. In arguing that the stock did not indirectly secure the loans, the Trustee contends that the Borrowers have failed to identify any restriction or limitation on the stock itself requiring that the stock or its proceeds be used to pay the Bank. In response, the Borrowers identify several restrictions on the SIP Shares, which they claim implicate 12 C.F.R. § 221.2(g)(1)(i), which states that "*Indirectly secured* (1) Includes any arrangement with the customer under which: (i) The customer's right or ability to sell, pledge, or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding." The Trustee replies that the identified restrictions all operate in favor of Comdisco, not the Bank, and, as a result, the shares cannot amount to an indirect security— at least not in favor of the Bank.

The Trustee claims that there was no restriction in the SIP Notes or any other transaction document providing that the SIP Shares could not be pledged as security for other loans. But the Trustee cannot dispute that there were restrictions on the SIP Shares and the SIP Participants were at least told that they could not pledge the shares as collateral for other loans. Furthermore, he asserts that even if the stock was restricted, the definition of "indirectly secured" is not satisfied because the Bank in good faith did not rely on the stock as collateral for

the loan. See 12 C.F.R. § 221.2(g)(2)(iv). According to the Trustee, the undisputed facts show that the Bank did not rely on the stock as collateral because: (1) the Borrowers—not Comdisco or the Bank—controlled the stock, (2) the Bank structured the transaction so it could collect the principal and interest without having to liquidate the stock in the event of default on the loans; and (3) the Bank could rely on Comdisco's guaranty in the event of defaults on the loans. We are a bit confused by the assertion that the Borrowers controlled the stock. This assertion conflicts with the record evidence that the shares were held by Mellon Bank, Comdisco's transfer agent, in a special account that only certain Comdisco officers could sign to release the shares to ensure that the shares would not be sold or transferred without paying off the Note. (SA:496) Also, the accounts were described as "inaccessible" (*id.*), presumably meaning that they were inaccessible to the SIP Participants. In addition, each SIP Participant had executed a stock power in blank that was held by Comdisco or Mellon Bank and would allow the holder to sell the shares in the open market or transfer the shares to itself. (*Id.*)

We are unsure how the second fact relied on by the Trustee indicates that the Bank in good faith did not rely on the stock as collateral for the loans. It seems that the Borrowers are right—this seems to be simply a restatement of the fact that the loans were not directly secured by the shares. Also the Trustee overlooks the two factors specifically mentioned in 12 C.F.R. § 221.117(b) as some indication that the bank had not relied upon the

stock as collateral—that "the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan" and "the loan . . . was payable on one or more fixed maturities which were typical of maturities applied by the bank to loans otherwise similar except for not involving any possible question of stock collateral. As stated earlier, the Borrowers' financial statements support a reasonable inference that the Bank did not rely on them to support the loans.

Next, the Trustee argues that the SIP Shares were not collateral for Comdisco's guaranty. He points to the lack of any right of Comdisco to sell the SIP Shares without authorization from the SIP Participants. The Trustee seems to overlook the fact that each of the SIP Participants had to deliver to Comdisco a stock power endorsed in blank with respect to the SIP Shares. Thus, each participant effectively authorized Comdisco to sell his or her SIP Shares. The Trustee's argument is unpersuasive.

The Trustee claims "the Bank could not have relied on the stock as collateral because it had Comdisco's guaranty, and . . . Comdisco had sufficient assets to satisfy its obligations under the guaranty without resorting to the stock." This unsupported conclusory assertion does not establish as a fact that the Bank did not rely on the stock as collateral. The Trustee offers no explanation why the Bank could not have relied on both the stock and the guaranty, and we are unaware of any. The Bank relied on Comdisco's guaranty, which one could reasonably find was secured by the stock.

Thus, there is at least a reasonable inference that the Bank indirectly relied on the stock as collateral for the loans.

If Comdisco committed "extending" violations of Regulation G, then it seems that the Bank likewise committed "extending" violations of Regulation U. And it necessarily would follow from such violations that the Bank also committed "arranging" violations of Regulation G. *See* 12 C.F.R. § 221.3(a)(3) ("No bank may arrange for the extension . . . of any purpose credit, except upon the same terms and conditions under which the bank itself may extend . . . purpose credit under this part."). See 12 C.F.R. § 221.118 (referencing 12 C.F.R. § 207.103; see §§ 207.103(a)(3), 207.103(g)). In addition, the record establishes that neither Comdisco nor the Bank provided Form G-3 or Form U-1 to the Borrowers. Thus, if the guaranty and loans were secured directly or indirectly by the stock, then both Comdisco and the Bank would have committed "Purpose Statement" violations of Regulations G and U as well. *See* 12 C.F.R. § 207.3(e) (in the case of extension of credit secured directly or indirectly by margin stock, "the lender shall require its customer to execute Form G-3); 12 C.F.R. § 221.3(b) (requiring a bank when extending credit secured directly or indirectly by margin stock in an amount exceeding $100,000 to obtain an executed Form U-1 from its customer).

We do not decide whether Comdisco or the Bank violated Regulation G or U, however. Even assuming a violation, as addressed below, the district court correctly

decided that the Borrowers could not assert such a violation as an affirmative defense.

## B.  Assertion of Violations of Regulations G and U as Affirmative Defenses

The Borrowers argue that the district court erred in concluding that they had no private right of action under § 7(d) or § 29(b) of the Securities Exchange Act of 1934 and therefore lacked standing to assert the alleged violations of Regulations G and U as affirmative defenses.[6] The district court's decision followed *Blair v.*

---

[6]  Section 7(d) provides in pertinent part: "It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section." Section 29(b) provides: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have

(continued...)

*Bank One, N.A.*, 307 B.R. 906 (N.D. Ill. 2004), *appeal dismissed in light of settlement*, which relied on *Bassler v. Cent. Nat'l Bank*, 715 F.2d 308 (7th Cir. 1983). The Borrowers contend that the district court's reliance on *Bassler* and *Blair* was misplaced.

In *Bassler*, a borrower sought to void a group of loans that were obtained to finance the purchase of stock. The borrower claimed that the lender violated § 7(d) of the Securities Exchange Act of 1934 and Regulation U by failing to obtain a Regulation U statement from him. He also alleged that the lender violated § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by failing to disclose that the stock was worthless. *Bassler* held that neither § 7(d) nor § 29(b) conferred a private right of action in investment borrowers as against investment lenders. *Id.* at 313. We considered the Act's main purposes which were "to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry," *id.* (citing H.R. Rep. No. 1383, 73d Cong., 2nd Sess. 8 (1934)) and "to safeguard the national economy," *id.* The House Report noted that the Act's main purpose was not the

---

[6]  (...continued)

acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ." 15 U.S.C. § 78cc(b).

protection of the small speculator, though that would be achieved as well. Nothing suggested a Congressional intent to create a private right of action in borrowers as against lenders. We therefore concluded that the district court properly dismissed the plaintiff's claim that the loans were void based on violations of Regulation U. *Id.*

*Blair* arose from Comdisco's bankruptcy. Bank One filed a proof of claim for the outstanding loans to SIP Participants. Comdisco objected on the grounds that the loans violated margin regulations. Several SIP Participants (including most of the Borrowers in our case) intervened. The bankruptcy court held that neither Comdisco nor the intervenor borrowers had statutory standing to challenge the legality of the loans underlying Bank One's claim. On appeal to the district court, Comdisco and the borrowers asserted that the loans violated Regulation U and that § 7(d) and § 29(b) of the Securities Exchange Act provided them a defense to Bank One's claim. Comdisco and the SIP Participants argued that *Bassler* was not controlling because they asserted the regulatory violation as an affirmative defense, not a separate cause of action. The district court rejected this argument as one "of semantics." *Blair*, 307 B.R. at 909. Although the district court noted that the intervenor borrowers had moved for declaratory judgment rather than asserting a defense (whereas Comdisco filed an objection to Bank One's claim), the court held that neither § 7(d) nor § 29(b) provided Comdisco or the SIP Participants with a defense to Bank One's claim and they therefore had no standing to challenge the legality of the loans. *Id.* at 909-10.

Thus, the Borrowers' argument that the district court misplaced its reliance on *Blair* because the intervenors did not raise § 29(b) defensively lacks any traction. The *Blair* court concluded that "no matter what the label, this cause of action does not exist under § 7(d) and § 29(b)"—because the intervenor SIP Participants and Comdisco sought a declaration that the loans were void because of the alleged margin violations, "*Bassler* controls." *Id.* at 910. The court reasoned that "Congress did not intend to protect investors with § 7. . . . [T]he main purpose of § 7 was to control the excessive use of credit in security transactions." *Id.* (quotation omitted). It also concluded that *Bassler*'s holding was not limited to a technical violation of Regulation U but also reached direct, substantive violations, including where the bank loans financed 100% of the stock purchases. *Id.*

*Shearson Lehman Bros., Inc. v. M & L Invs.*, 10 F.3d 1510 (10th Cir. 1993), provides additional authority for the conclusion that the Borrowers cannot assert violations of margin regulations as an affirmative defense. In *Shearson*, a stockbroker brought a breach of contract action and the purchasers asserted an affirmative defense for nonpayment based on the stockbroker's violation of Regulation T, a margin regulation concerning extensions of credit by brokers and dealers. The court found that the stockbroker violated the regulation, which required the holder of a cash account to "promptly liquidate" in the event of a purchaser's failure to make timely payment. *Id.* at 1514. However, the court concluded that there is no affirmative defense to a breach of contract claim for Regulation T violations. *Id.* at 1516. The court stated that its conclusion was "most consistent"

with the policy behind Regulation T and other regulations—to protect the market in general—not to benefit individual investors. *Id.* It also reasoned that the regulations placed the burden of compliance with margin requirements on both broker and client, so it would be inconsistent to place the burden of noncompliance on brokers in contract disputes. *Id.*

We find the reasoning of *Bassler*, *Blair*, and *Shearson* persuasive. Even if Comdisco and the Bank violated Regulation G or U, the Borrowers' illegality defense based on such a violation fails. There is nothing inherently illegal in a contract to borrow money to purchase stock, and a regulatory violation does not make such a contract "illegal." *See ADM Investor Servs., Inc. v. Collins*, 515 F.3d 753, 755-56 (7th Cir. 2008). Furthermore, Regulations G and U were not designed to protect individual investors such as the Borrowers; they were designed to protect the general public. *See id.* ("balky customers are not in the zone of interests protected by margin-posting requirements"). To allow the Borrowers to assert the margin violations as an affirmative defense to the Trustee's action on the Notes would place the Borrowers in a "heads I win, tails you lose" position. *See Bache Halsey Stuart, Inc. v. Killop*, 509 F. Supp. 256, 259 (D. Mich. 1980). If the value of the Comdisco stock went up—as it did for a while—the Borrowers gain on their investment. And if the stock goes down, the Borrowers can void the loan contract and lose nothing. *See id.* We have little doubt that if Comdisco had not filed bankruptcy and its stock had continually soared in value, the Borrowers would not be before us now seeking to void

the Notes. The district court correctly decided that the Borrowers could not assert violations of Regulations G and U as affirmative defenses.

The Borrowers try in vain to persuade us that they may assert the alleged margin violations as affirmative defenses. They first contend that no private right of action is necessary to assert a plaintiff's violation of federal law as an affirmative defense. Yet the cases upon which they rely actually support the Trustee's view that an illegality defense is available only to those whom the statute at issue was designed to protect. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86 (1982) (defense under § 8(e) of the National Labor Relations Act could be "raised by a party which § 8(e) was designed to protect, and where the defense is not directed to a collateral matter but to the portion of the contract for which enforcement is sought"); *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (holding that the Investment Advisors Act implies a limited remedy to void an investment advisors contract while recognizing that the Act was "intended to benefit the clients of investment advisers"); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970) (provision at issue "was intended to promote the free exercise of the voting rights of stockholders" (internal quotations omitted)); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 980 F.2d 449, 455 (7th Cir. 1992) (noting that illegality may be a defense to contract but not allowing hospital's failure to comply with statutory certification requirement to be used as a defense to contract action for payment of hospital bills); *Bankers Life Co. v. Denton*, 458 N.E.2d 203,

205 (Ill. App. Ct. 1983) (allowing mortgagees to assert noncompliance with HUD mortgage servicing require-ments as an affirmative defense to a foreclosure action because it was necessary "to effectively insure that the interests of the primary beneficiaries of the H.U.D. mort-gage servicing requirements are being protected"). Other cases they cite involved contracts the subjects of which were themselves illegal or "infected by an illegal conflict of interest"; as a result, the contracts were unenforceable. See *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 566 (1961) (allowing nonenforcement of contract infected by an illegal conflict of interest on the part of the government official who participated in contract negotia-tions in violation of federal conflict-of-interest statute aimed at ensuring honesty in government's business dealings); *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 88 (1902) (assuming that only the Attorney General could bring an action to enforce the Sherman Act and allowing the defense that the contract is illegal under the antitrust laws); *Kessinger v. Standard Oil Co.*, 245 Ill. App. 376, 1925 WL 4623, at *4 (1925) (holding tenant could not recover against appellant where his cause of action was founded on his own violation of the law which prohibited the tenant's action of excavating and taking sand from river).

*Johnston v. Bumba*, 764 F. Supp. 1263, 1279 (N.D. Ill. 1991), *aff'd*, 983 F.2d 1072 (7th Cir. 1992), also cited by the Borrowers, did allow a defendant to assert as a defense to an action to recover on a promissory note that the securities were sold in violation of the securities laws. However, our affirmance in *Johnston* did not adopt or even

address the district court's ruling that the defendants prevailed based on the securities law violations. Instead, we affirmed on the alternate ground that plaintiffs failed to prove the amount due on the note.

The Borrowers then argue that they may assert the defense of illegality to an action on the Notes under Illinois law. While Illinois recognizes illegality as an affirmative defense to a breach of contract action, the defense applies where the contract itself is illegal. *See, e.g.*, *Kramer v. McDonald's Sys., Inc.*, 396 N.E.2d 504, 508-09 (Ill. 1979) (holding Illinois's Uniform Limited Partnership Act prohibited a limited partner from taking collateral to secure repayment of his capital contributions and franchisor had standing to assert this as a defense to limited partner's conversion action); *Cothran v. Ellis*, 125 Ill. 496, 498-99 (1888) (assuming that a note representing debt for gambling transactions would be against public policy); *Am. Buyers Club of Mt. Vernon, Ill., Inc. v. Grayling*, 368 N.E.2d 1057, 1058-61 (Ill. App. Ct. 1977) (holding that an unconscionable contract for "membership" in a "buyer's club" that violated Regulation Z and the Truth in Lending Act in failing to disclose finance charges was void and note was unenforceable). Furthermore, where, as here, the statute allegedly violated "is federal, federal law determines . . . whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract." *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) ("supposing that the contract does violate section 2(c) of the Mineral Lands Leasing Act, this does not neces-

sarily make it unenforceable"); *see also Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("the effect of illegality under a federal statute is a matter of federal law"); *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942) ("When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation . . . are . . . federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted."). Thus, the effect of an alleged violation of Regulation G or U on the enforceability of the Notes is determined by federal—not Illinois—law.

The Borrowers next argue that § 29(b) permits them to assert violations of Regulations G and U as affirmative defenses. The principal authority they cite is *TAMA v. Lewis*, which held that there is a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisors contract, see 15 U.S.C. § 80b-1-15. In so holding, the Court stated that the Act was "intended to benefit the clients of investment advisers." 444 U.S. at 17. The Court said:

> the statutory language itself fairly implies a right to specific and limited relief in a federal court. By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract.

*Id.* at 18. The Court stated that "this Court has previously recognized that a comparable provision, § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), confers a 'right to rescind' a contract void under [that statute]." *Id.* at 18-19 (citing *Mills*, 396 U.S. at 388).

In *Mills*, stockholders sought to set aside a corporate merger, alleging it was accomplished through a materially false and misleading proxy statement in violation of the Securities and Exchange Act's disclosure requirements. The Court observed that the provision relating to proxies was "intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation . . . of the real nature of the questions for which authority to cast his vote is sought.' " *Mills*, 396 U.S. at 381. The Court held that the stockholders had a cause of action; to hold otherwise would frustrate the congressional purpose. *Id.* at 382-83. The Court instructed lower courts that this conclusion "implie[d] nothing about the form of relief to which they may be entitled," *id.* at 386, and in selecting a remedy, courts "should exercise the sound discretion which guides the determinations of courts of equity[.]' " *Id.*; *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 64 (1975) ("*Mills* could not be plainer in holding that the questions of liability and relief are separate in private actions under the securities laws, and that the latter is to be determined according to traditional [equitable] principles"). *Mills* explained that § 29(b) did not require that the merger be set aside just because the merger agreement was a "void" contract." *Id.* at 386-87. Rather, it precluded the guilty party from enforcing the

contract against "an unwilling innocent party" and rendered "the contract merely voidable at the option of the innocent party." *Id.* at 387. Neither *TAMA* nor *Mills* involved an alleged violation of Regulation G or U. Thus, neither case recognized that investors are among those the Regulations were designed to protect. (And it was not determined that the Borrowers were "unwilling innocent parties" anyway.)

The Borrowers also cite to *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1036-37, 1051 (7th Cir. 1997), and *Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807, 816 (7th Cir. 1973), for the proposition that "Section 29(b) can be asserted defensively . . . to defeat the enforcement of contracts, and if successful, outright dismissal of the contract claim . . . ." In *Sun Chemical Corp.*, we affirmed the dismissal of a counterclaim based on a stock option transfer agreement that was made in violation of § 10(b) and Rule 10b-5. We concluded that the agreement was void under § 29(b) based on the violations. 553 F.3d at 1051. However, courts have implied from § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 a private right of action for fraud. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975). As discussed, the Borrowers have no private right of action to assert Regulation G or U violations.

The Borrowers also rely on § 29(c), which they say implies a right to assert a Regulation G or U violation

defensively under § 29(b).[7] Notably, no authority is offered to support this view. And nothing in the Securities Exchange Act compels the conclusion that Congress specified in § 29(c) the few circumstances under which a contract made or performed in violation of § 7(d) may escape invalidation under § 29(b). Moreover, § 29(c) preserves the validity of a loan made in violation of the margin regulations unless the person making the loan has "actual knowledge" that the loan violated the regulations. The record at this stage does not establish that the Bank or Comdisco had such knowledge. The district court found that Comdisco and the Bank obtained the advice of outside counsel, who obtained an opinion that the loans did not violate the regulations, before making any representations as to the SIP Plan's compliance. Such a finding seems at odds with an inference that Comdisco or the Bank had actual knowledge of the alleged violations of the regulations.

We find no error in the district court's conclusion that the Borrowers lack standing to raise a violation of Regulation G or U as an affirmative defense.

---

[7] Section 29(c) provides in part: "Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit . . . unless at the time of the making of such loan or extension of credit . . . the person making such loan or extension of credit . . . shall have actual knowledge of facts by reason of which the making of such loan or extension of credit . . . is a violation of the provisions of this chapter or any rule or regulation thereunder . . . ." 15 U.S.C. § 78cc(c).

## C.  Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5[8]

The Borrowers argue that the grant of summary judgment in favor of the Trustee on the § 10(b) illegality defense should be vacated as well. The Trustee sought summary judgment on this defense solely on the basis that the Borrowers could not prove any false statement ("falsity"). He did not contest that they could establish the intent to deceive or reckless disregard for the truth ("scienter"). Then, in reply, he argued that because he had sought summary judgment based on the falsity element, it became the Borrowers' burden to establish all elements of the § 10(b) defenses.

---

[8] Section 10(b) makes it "unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it "unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

As the moving party, however, the Trustee bore the initial burden of identifying the basis for seeking summary judgment. *See Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The party opposing summary judgment is not required to respond to grounds that were not raised by the movant. *See, e.g.*, *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment."). The fact that the Borrowers filed an expansive response brief, a Rule 56.1 response, and a statement of additional facts does not alter this rule. The responsive filings did not create a right in the Trustee to raise in reply new challenges to the Borrowers' evidence as to all other aspects of the § 10(b) illegality defense. Tellingly, the Trustee offers no authority to support his novel view that this "rather unusual course of the motion for summary judgment" made it necessary and proper for him to attack the additional elements on which he had taken a pass initially. Granting summary judgment on

the basis of the newly raised scienter argument, as the district court did, raises important fairness concerns. And this is especially true where the Borrowers had alerted the district court in their motion to strike that they had additional evidence supporting the scienter element.

The Trustee asserts that the Borrowers deprived themselves of the opportunity to present evidence on the scienter element: They offered some, but not all, of their evidence to establish scienter. We are unaware of any authority that required the Borrowers to marshal all the evidence that they had on an issue that was not asserted by the party seeking summary judgment. Had the scienter issue been properly placed in issue, the Borrowers may have presented other evidence, or sought an extension and discovery under Rule 56(f). The Trustee criticizes the Borrowers for not seeking leave to file a sur-reply. But "there is no requirement that a party file a sur-reply to address an argument believed to be improperly addressed. . . ." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 n.1 (7th Cir. 2008). And a party need not "seek leave to file a sur-reply in order to preserve an argument for purposes of appeal. . . . " *Id.*

The Borrowers were not wrong in their understanding of their summary judgment obligations. While their choice may have been strategic—no one doubts that they could have sought leave to file a sur-reply and/or filed a Rule 56(f) affidavit—we are not about to insist that they have done so when the rules and case law give them options on how to proceed. Although the Borrowers addressed the newly raised arguments in their motion

to strike, the assertion of argument did not obligate them to present all of their evidence. Argument is not a substitute for facts supported by evidence as necessitated by Rule 56. Summary judgment is proper only if, *inter alia*, the nonmoving party has adequate notice and a reasonable opportunity to present its evidence in response to the movant's summary judgment materials. *Cf. Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010); *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009). The Borrowers did not have such an opportunity to be heard on the scienter issue.

On a related point, the Borrowers indicate that the district court held them to a heightened standard of proof of scienter. ("Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).) Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), the district court looked for evidence that would raise a "strong inference" of scienter. *Tellabs* dealt with the heightened pleading standard for private securities fraud suits under the Private Securities Litigation Reform Act ("PSLRA"), § 21D(b)(2) of which provides that a complaint shall allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Neither the PSLRA nor *Tellabs* changed the well-established summary judgment standards. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008) (noting that the PSLRA pleading standard is not the same as the summary judgment standard). Indeed, the Court expressly stated that "the test at each stage [pleading, summary judgment, and judgment as a

matter of law] is measured against a different backdrop." *Tellabs*, 551 U.S. at 324 n.5. On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010). Rather, the court's task is a pointed one: to determine based on the record whether there is a genuine issue of material fact requiring trial. *Celotex Corp.*, 477 U.S. at 330; *Anderson*, 477 U.S. at 249; *Kodish*, 604 F.3d at 507. The district court erred in holding the Borrowers to proof of facts that would raise a strong inference of scienter.

The district court had the discretion to rule on the summary judgment motions without relying on the newly raised arguments in the Trustee's reply. To be sure, upon reviewing the Trustee's reply brief and learning that the newly raised arguments might have merit, the court could have offered the Borrowers an opportunity to file a sur-reply and additional evidence. It did not. Instead, it denied their motion to strike as moot. But the Borrowers' legitimate arguments against consideration of the newly asserted grounds for summary judgment did not become moot by the simple fact that the district court (1) decided to consider them and (2) decided them favorably toward the Trustee. The analogy offered by the Borrowers is apt: "It would be as if the plaintiff moved for a jury trial and the judge, without ruling on the motion, conducted a bench trial, rendered judgment for the defendant, and then dismissed the plaintiff's motion as moot." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1027 (7th Cir. 2006). And because

the district court's decision does not explain why it thought the motion to strike was moot, we are unsure how much consideration was given to that motion.

The Trustee submits that we can affirm the grant of summary judgment on the § 10(b) illegality defense on several alternative grounds—there is no evidence of any fraudulent misrepresentation, the Borrowers seek an unwarranted extension of the private right of recovery under § 10(b), they have no evidence of a manipulative or deceptive device, the alleged misrepresentations regarding Regulations G and U were not made "in connection with the purchase or sale" of a security, the Borrowers cannot prove reliance, and they cannot show that any alleged misrepresentation was material. The Trustee cites *Ruth v. Triumph P'shps*, 577 F.3d 790 (7th Cir. 2009), for the proposition that "'[w]e may affirm summary judgment on any basis supported in the record.'" *Id.* at 796 (quoting *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008)). This statement was made in the context of addressing the appellant's claim that the appellee could not make a particular argument because it had not cross-appealed—a procedural situation quite different from what we have here. *Ruth* and the cases it cites stand for the broad proposition that we may affirm a judgment on a basis supported in the record even when the district court did not rely on that basis. Neither *Ruth* nor any case it cites addresses whether we may affirm a grant of summary judgment on alternative grounds that were not raised until the filing of a reply brief. Although "we may affirm a grant of summary judgment on any alternative basis found in the

record as long as that basis was adequately considered by the district court and the nonmoving party had an opportunity to contest it," *Best v. City of Portland*, 554 F.3d 698, 702 (7th Cir. 2009), we may not affirm on an alternative basis that was not raised in support of summary judgment, *id.* at 703 (reversing grant of summary judgment and remanding where "there [was] not enough of a record . . . to affirm on an alternative basis").

Here, the alternative bases argued by the Trustee were not raised in the district court until the filing of the reply, and the Borrowers did not have an adequate opportunity to contest them. Further, it is unclear whether the district court gave any consideration to these other grounds. Thus, it would be unfair to affirm summary judgment on these alternative bases, and we decline the Trustee's invitation to do so.

### D.  Section 17(a) of Securities Act of 1933

As an affirmative defense, the Borrowers claimed that the Notes are unenforceable because Bank One and Comdisco violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). Specifically, they alleged that "[t]he materially false and misleading statements, omissions, and course of conduct of Bank One and Comdisco were made and employed as part of a scheme in order to deceive the SIP Participant, to obtain the SIP Participant's property, and to operate as a fraud upon the SIP Participant . . . ." The version of § 17(a) in effect at the time of the transactions at issue read:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1)  to employ any device, scheme, or artifice to defraud, or

(2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

The Borrowers contend that the grant of summary judgment on their § 17(a) defense should be vacated because the district court did not articulate any basis independent of its holding that Regulations G and U were not violated for granting summary judgment on that theory. The Trustee responds that the court relied on other bases and implies that it concluded that the Borrowers failed to establish that Comdisco had the requisite scienter to establish a § 17(a) violation. He also argues that the Borrowers have waived any other arguments they may have regarding the § 17(a) defense by failing to assert them on appeal, which is correct. *See Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 793 (7th Cir. 2007).

The district court's reasoning for granting summary judgment on the § 17(a) defense is cryptic. The Trustee may defend the district court's judgment based on any argument raised below, *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 892 (7th Cir. 2010), provided "the alternative basis has adequate support in the record," *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). However, the Trustee has chosen to defend on only one ground: the Borrowers' failure to establish that "Comdisco had an intent to deceive, manipulate or defraud." (Appellee Br. 59 (AA:12.)) The problem with this: as discussed, the district court erroneously granted summary judgment on the ground that the Borrowers failed to offer evidence of scienter.[9] Therefore, the grant of summary judgment on the § 17(a) defense should be vacated.

---

[9] Proof of scienter is an element of a violation of § 17(a)(1), but not § 17(a)(2) or (a)(3). *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980); *see also Mueller v. Sullivan*, 141 F.3d 1232, 1235 (7th Cir. 1998). The Borrowers' allegations that the "materially false and misleading statements, omissions, and course of conduct of Bank One and Comdisco were made and employed as part of a scheme to deceive the SIP Participant . . . and to operate as a fraud upon the SIP Participant" (SA:136) seem to fall within § 17(a)(1). In their reply, the Borrowers imply that their defense falls under § 17(a)(2) or (a)(3). The district court may consider the matter if necessary; we are not deciding the issue here.

### E. Extension of the Court's *Duncan*/*Paul* Rulings

The Borrowers contend that the district court erred in extending its December 2007 summary judgment rulings in *Duncan*/*Paul*. The court's opinion states that "[t]he instant defendants raise the same counterclaims and defenses and the court's ruling in [*Duncan*/*Paul*] will not be revisited" (AA:7) and that they "have raised a number of arguments, all of which have been rejected in earlier opinions and will not be addressed again." (AA:13.) The Borrowers argue that such language shows that the district court did not reach the substance of their defenses but merely gave its earlier rulings preclusive effect. Although one might draw such a conclusion if the quoted language is taken out of context, we do not read this language in a vacuum. The record reveals that the district court gave the Borrowers an opportunity to present their own arguments and evidence and gave them some consideration. We understand the district court as saying that it was adopting both its prior rulings and its supportive reasoning. (Whether the grant of summary judgment was proper based on the same grounds on which it was granted against Duncan and Paul is another question addressed below.)

The Borrowers challenge the grant of summary judgment on the fraud set-off defense, which they assert was based on a lack of evidence of reliance (an essential element) by Duncan or Paul. *See Linhart v. Bridgeview Creek Dev., Inc.*, 909 N.E.2d 865, 870 (Ill. App. Ct. 2009). In the *Duncan*/*Paul* decision, the district court did note Duncan's

and Paul's lack of an attempt to show reliance on the alleged misrepresentations. But the principal ground for the court's ruling was that the alleged misrepresentations were representations of legal opinion, which cannot support a claim for fraud. (SA:178 (citing *City of Aurora v. Green*, 467 N.E.2d 610, 613 (Ill. App. Ct. 1984) ("As a general rule, one is not entitled to rely upon a representation of law since both parties are presumed to be equally capable of knowing and interpreting the law.")). Thus, it is not surprising that the court did not view the Borrowers' declarations, which seem to support a reasonable inference of reliance, as requiring a result different from that reached in *Duncan/Paul*. (The Trustee does not argue that the Borrowers' affidavits could *not* support a reasonable inference of justifiable reliance; he merely criticizes them as self-serving. (See Appellee's Br. 60-61 (recognizing that appellants offered "affidavits that detail their purported reliance on the Bank's alleged false and misleading statement regarding compliance with the margin regulations"))). As a result, he has waived any such argument for purposes of this appeal.[10] *See, e.g.*, *O'Neal v. City of Chicago*, 588 F.3d 406 (7th Cir. 2009) (failure to make argument on appeal amounts to waiver).

---

[10] In connection with the § 10(b) illegality defense, the Trustee did assert that the Borrowers could not show reliance. But he has not defended the application of the *Duncan/ Paul* rulings to the appellants based on non-reliance, and we will not make a party's argument for him. *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

Nonetheless, the district court's analysis falters. The Borrowers argue that they identified a line of cases that recognizes an exception to the general rule that legal opinions cannot support a fraud claim, which the district court never considered. *See West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 394 (7th Cir. 1988). In *West*, we recognized that under Illinois law, "[a] statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context." *Id.* at 393. We then quoted an Illinois Supreme Court opinion:

> Wherever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation.

*Id.* (quoting *Buttitta v. Lawrence*, 178 N.E. 390, 393 (Ill. 1931)). Thus, whether a statement is one of fact or opinion is an issue of fact. *Id.* ("Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case."). Factors to be considered in determining this issue include "the access of the parties to outside information," the parties' relative sophistication, and whether the speaker has specialized knowledge. *Id.* at 393-94. Therefore, "it is not 'the form of the statement which is important or controlling, but the

sense in which it is reasonably understood.'" *Id.* at 394 (quoting Prosser and Keeton on Torts § 109, at 755 (W. Keeton 5th ed. 1984)). The district court's opinion does not reflect consideration of whether the alleged misrepresentations should be considered statements of fact or opinion under this authority.

The Trustee further argues that the district court did not have to address the fraud set-off defense in order to rule in his favor because the court concluded that the Borrowers failed to present evidence of scienter, which is necessary to prove a fraud set-off claim. As discussed, ruling on the basis of a lack of scienter was error. *E.g.*, *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."). So, too, it would be error to extend the *Duncan/Paul* rulings on the basis of a lack of evidence of scienter—particularly where the Trustee did not even argue below that a failure of proof of scienter warranted summary judgment on the fraud set-off defense. *Cf. Best*, 554 F.3d at 702. The district court erred in granting summary judgment to the Trustee on the fraud set-off defenses.

The Borrowers also challenge the district court's failure to address the merits of their negligent misrepresentation set-off defense. In the *Duncan/Paul* summary judgment ruling, the court held that the record did not support the claim that either Comdisco or the Bank was "in the business of supplying information for the

guidance of others in their business transactions" (SA:182), which is necessary for that defense. The Borrowers submit that they had such evidence but the court did not consider it. The Trustee has not challenged this assertion on appeal, and our review of the materials cited by the Borrowers indicates that they may have enough evidence to raise an issue of fact on this matter. The questions whether they have presented enough evidence to satisfy the "in the business of supplying information" element and whether they can ultimately prevail on their negligent misrepresentation defense are left for the district court's determination.

### F. Excuse-of-Nonperformance Defenses

The Borrowers' next challenge the grant of summary judgments on their excuse-of-non-performance defenses. Under Illinois law, they argue, the Bank's compliance with § 17(a), § 10(b), and Regulation U were implied terms of the parties' contracts and, by failing to comply with these laws, the Bank breached the contracts, excusing their performance.[11] The Trustee does not dispute that under Illinois law, laws in existence at the time a contract is executed, absent contractual language to the contrary, are deemed part of the contract "as if they were expressly . . . therein." *Selcke v. New England Ins. Co.*, 995 F.2d 688, 689 (7th Cir. 1993); *see also Ill. Bankers Life Ass'n*

---

[11] It seems that the district court misunderstood the defense as based on a prior breach of contract by Comdisco.

*v. Collins*, 341 Ill. 548, 552 (1930). Thus, § 17(a), § 10(b) and Regulation U are implied terms of the Notes. The Borrowers then assert that "a party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement. . . ." *George F. Mueller & Sons, Inc. v. N. Ill. Gas Co.*, 336 N.E.2d 185, 189 (Ill. Ct. App. 1975). Yet only a material breach of a contract term will excuse the other party's nonperformance. *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002); *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 706 F.2d 193, 196 (7th Cir. 1983) (referring to this proposition as "black letter law in Illinois").

The Trustee responds that the Borrowers have waived any breach by accepting the loan proceeds, participating in the SIP Program, and failing to object to the SIP Program or Notes until they had lost the opportunity to profit. As the party claiming waiver, the Trustee had the burden to prove that the Borrowers (1) knew of their right to assert the Bank's breaches, and (2) intended to waive the alleged breaches. *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991). Yet he did not do so in this court or below. Furthermore, the Trustee's reliance on the Borrowers' failure to raise any objection to the SIP Program or Notes reveals the weakness of his position. "An implied waiver may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it." *Wolfram P'ship, Ltd. v. LaSalle Nat'l Bank*, 765 N.E.2d 1012, 1026 (Ill. App. Ct. 2001). Implied waiver arises "where (1) an unexpressed intention to waive can be clearly inferred

from the circumstances or (2) the conduct of the waiving party has misled the other party into a reasonable belief that a waiver has occurred." *Id.* The Trustee has not identified the facts in the record that would support a finding of implied waiver. Thus, he has not adequately developed this waiver argument, and the result is a waiver of the argument. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008).

With respect to the Bank's alleged violations of § 17(a) and § 10(b), the Trustee has argued that the SIP Loans were not illegal, emphasizing alleged compliance with the margin regulations. (Appellant's Br. 61 ("Defendants finally argue that their failure to pay on the SIP Notes is excused because the Bank breached its own contractual obligations by not complying with the margin regulations.")). But the excuse-of-non-performance defense is based not only on alleged margin rule violations but also on violations of § 17(a) and § 10(b). And while the Trustee argues that the Borrowers were not in the zone of interests protected by the margin regulations, he does not make such an argument with respect to § 17(a) or § 10(b). Given our conclusion that the grant of summary judgment on the § 17(a) and § 10(b) defenses was error, the grant of summary judgment on the excuse-of-non-performance defense was also error. It remains to be decided, though, whether the Bank's alleged noncompliance with applicable laws was a material breach.

Assuming a violation of Regulation U, the Trustee argued below that under the principles of *ADM Investor*

*Services*, such a violation would not excuse the Borrowers' nonperformance. The district court agreed, concluding that like the investor in *ADM*, the Borrowers were not in the "zone of interests" protected by the margin regulations. The Borrowers maintain that reliance on *ADM Investor Services* was misplaced because the margin rule violated in that case (and in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615 (5th Cir. 1977) (per curiam) cited by *ADM*), was not incorporated into the parties' contract. That is a difference, but it is not dispositive. In *ADM Investor Services*, we concluded that the trader was not excused from paying on his futures contract because of the merchant's noncompliance with the board of trade's margin requirements. *ADM Investor Servs.*, 515 F.3d at 755-57; *see also Thomson McKinnon Secs., Inc. v. Clark*, 901 F.2d 1568, 1570-71 (11th Cir. 1990) (holding trader could not defend against broker's action for nonpayment based on broker's alleged violation of exchange rules by overextending credit where the rules were incorporated into the parties' agreements and the trader asked the broker to ignore a rule). In reaching this conclusion, we reasoned that "margin requirements in futures markets are not designed to protect investors . . . from adverse price movements. . . . [B]alky customers are not in the zone of interests protected by margin-posting requirements." *ADM Investor Servs.*, 515 F.3d at 756-57.

The Borrowers assert that Regulation U was not intended to protect banks, but that it and other margin regulations were intended to "protect the general public." (Appellant Br. 77.) They take this language from *ADM*

*Investor Services* but fail to put it into proper context. There, we said that Federal Reserve margin regulations "could be seen as an effort to protect the general public from the effects of investors' and brokers' activities." *Id.* at 756. Thus, we understood that margin regulations such as Regulation U were intended to protect "the general public"—not individual investors such as the Borrowers. Our recognition that the Federal Reserve regulates securities transactions "as part of its control of the aggregate money supply," *id.*, confirms this. It is difficult to see how excusing the Borrowers' performance here would protect the general public, rather than merely protect the Borrowers from what turned out to be a bad investment. Nor can we see how excusing repayment of the loans would lend stability to the aggregate money supply.

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgments in favor of the Trustee are AFFIRMED with respect to the Borrowers' lack of standing to assert the alleged violations of Regulations G and U as affirmative defenses, but VACATED with respect to the following affirmative defenses: illegality under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, illegality under § 17(a) of the Securities Act of 1933, set-off for fraud, set-off for negligent misrepresentation, and excuse-of-nonperformance, and REMANDED for further proceedings not inconsistent with this opinion. Given our disposition of the appeals from the grants of summary

judgment, the appeals from the Amended Judgments are DISMISSED AS MOOT.

We appreciate the substantial efforts that the district court and counsel have expended in these matters to this point. However, for reasons discussed above, there is more to be done before this litigation can be put to rest.